Filed 7/20/26  P. v. Sandoval CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B338121 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA491982) |
| v. | |
| DAVID ALEXANDER SANDOVAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gustavo N. Sztraicher, Judge.  Affirmed and remanded with directions.

Kathy R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

A jury found defendant and appellant David Alexander Sandoval guilty of two counts of first degree murder and related charges arising from two separate incidents that occurred in late 2020. Defendant challenges his conviction on several grounds. He contends the trial court prejudicially erred in admitting statements he made to an undercover agent in what is commonly referred to as a *Perkins* operation. (*Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).) Defendant also contends the prosecutor committed multiple acts of misconduct during closing argument, and that his trial counsel provided ineffective assistance for failing to object to the misconduct. Finally, defendant argues cumulative error, and requests correction of a clerical error in the abstract of judgment.

We affirm the judgment of conviction in its entirety, and direct the superior court on remand to prepare a new abstract of judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### 1. The shooting of James Cortez (October 2020)

James Cortez was shot and killed on October 8, 2020, near Riverside Drive in the Silverlake neighborhood of Los Angeles. Witnesses saw three young males confronting Cortez, heard three to four gunshots, and saw Cortez fall to the ground. A silver sedan was seen fleeing the area. Surveillance video from security cameras at nearby businesses captured a silver Toyota Camry leaving the scene at the time of the murder. The police obtained the car's license plate from the video footage. The Camry had been reported stolen by the owner. It was later determined that the owner's daughter, Nicole M., had taken the car. Nicole was dating defendant at the time. When interviewed by the detectives investigating the shooting, Nicole told them that

2

defendant and another person named Kyler, who went by the moniker Cocaine, told her they had killed someone and needed to get rid of the gun.

## 2.     The shooting on Aldama Street (December 2020)

On the evening of December 9, 2020, Jose Campos Peralta, Jesus I. and Bionca I. were standing outside talking in front of a home on Aldama Street in Highland Park.  A dark sedan pulled up, and two men dressed in dark clothes got out of the car, and asked them "where you from?"  Jesus held up his hands, and they said they were from nowhere to signify they had no gang affiliation, but the men immediately started shooting.  Peralta was killed.  Bionca suffered non-fatal gunshot wounds to her arm and leg, and Jesus escaped injury.

Video footage from nearby security cameras captured the sedan in front of the house, as well as muzzle flashes.  It was later determined the car was a Lexus registered in the name of defendant's mother.  When the car was recovered, it had three recent bullet holes in it, as well as a work identification card with defendant's name and photograph.  During the investigation, text messages were recovered from defendant's cellphone showing that on December 9, 2020, defendant was looking to buy a firearm, was discussing a "mission" with other gang members, and talking about territory disputes with rival gangs in Highland Park.  Defendant was arrested on December 10, 2020.

## 3.     The *Perkins* operation

After his arrest, defendant was placed in a holding cell before being interviewed.  An undercover informant posing as an inmate and gang member (*Perkins* agent) was placed in the cell with him, and their conversation was recorded unbeknownst to

3

defendant.  Defendant introduced himself to the *Perkins* agent as "Troubles from Avenues."

Defendant and the *Perkins* agent engaged in conversation for almost two hours.  Defendant made various incriminating statements during their conversation related to both shooting incidents.  Defendant said the police swabbed his hands, probably looking for "gun powder," but he "wasn't the one who—you know," even though he did touch "it" afterward.  He also said the gloves he was wearing "ripped."  Defendant told the *Perkins* agent he knew where the gun was, but it was out of the neighborhood.  Defendant said he thought the only thing he did right was to make sure he did not keep anything inside the house, except a box of bullets.

Defendant told the *Perkins* agent the detectives had mentioned an old shooting from two months prior, but not the "recent" one that happened "yesterday."  Defendant said a revolver was used that "[d]ropped no shells" and they had worn face masks and hoods.  They had been "going back and forth … with the fools from Highland" for a while.  Defendant said, "[t]hat fool was a sitting duck.  He was just sitting there" in his own neighborhood, but they had been out "patrolling" for about 30 minutes, "hitting all the spots" when they just happened upon him.  Defendant lamented that the passenger side of his car got shot up "when that fool busted back."  Defendant said he sold the gun the next day and bought a Glock.

At one point, defendant also said that a girl was with them, and they were in her mother's car.  It is unclear from the context to which incident defendant was referring.

We discuss relevant facts of the *Perkins* operation in more detail in part 1 of the Discussion below.

4

## 4.     Charges, verdict and sentencing

By amended information, defendant was charged with two counts of premeditated murder (Pen. Code, § 187, subd. (a);[1] counts 1 & 4), one count of attempted murder (§§ 187, subd. (a), 664; count 9), two counts of possession of a firearm with a prior juvenile adjudication (§ 29820, subd. (b); counts 3 & 6); and two counts of assault with a firearm (§ 245, subd. (a)(2); counts 10 & 11).  The People also alleged a prior juvenile adjudication as a strike prior within the meaning of the "Three Strikes" law, personal firearm use as to count 1, and several aggravating factors.

The jury found defendant guilty of both counts of premeditated murder (counts 1 and 4), and found true the personal firearm use allegation as to count 1.  The jury also found defendant guilty of both counts of possession of a firearm and both counts of assault with a firearm (counts 3, 6, 10 & 11).  The jury was unable to reach a verdict on the attempted murder count (count 9).  The court declared a mistrial for count 9, and it was dismissed.  For sentencing, defendant waived his trial rights and stipulated to his prior juvenile adjudication for carjacking (§ 215, subd. (a)) and the aggravating factors.

As to the two murder counts, the court sentenced defendant to consecutive terms of 25 years to life, doubled due to the prior strike.  The court imposed and stayed a three-year low term for the firearm use enhancement on count 1, and concurrent middle terms on the remaining counts.  Defendant's total sentence was 100 years to life.

---

[1]     All undesignated statutory references are to the Penal Code.

This appeal followed.

## DISCUSSION

### 1. Admission of defendant's *Perkins* statements

Defendant contends the admission of the statements he made to the *Perkins* agent violated his constitutional rights. We disagree.

#### 1.1 Background

After his arrest, defendant was initially held for a few hours at a police station near his home. He was then transported to the police station where the *Perkins* operation was conducted. When defendant was placed in the holding cell with the *Perkins* agent, he introduced himself as "Troubles from Avenues" and complained that he had already been held at another station "for four hours."

The *Perkins* agent asked defendant if the detectives told him how long he was going to be there. Defendant responded, "I asked 'em, like, hey, like, so—so I haven't been read my rights. Am I under arrest or am I being detained? He said I'm being detained. I'm, like, for what? Oh, like, to question you. I'm all, like, what do you wanna question me about?" Defendant said they were just "trying to get to [his] head" and scare him, but he was going to be respectful and keep "conversation to a minimum," the "least I gotta talk to 'em, the better." Defendant then asserted the police always try to get people to talk, they "ease their way into it, like … if people are stupid." He said he did not confirm or admit anything. "And they could say it all they want to, I'm not confirming shit."

Defendant and the *Perkins* agent continued to talk for about an hour, with defendant sometimes volunteering information or initiating conversation. One of the detectives then

6

stopped by the cell and told defendant they believed he was involved in a murder that occurred on October 8 on Riverside Drive, and that they would come get him in a few minutes because they had questions for him. After the detective left, defendant and the *Perkins* agent resumed talking. Defendant said, "I'm gonna ask for a—Imma [*sic*] plead the Fifth and ask for a lawyer, straight up. 'Cause I don't wanna make it any worse. What else can I do? I'm not gonna sit there and fucking talk to 'em. What am I gonna tell 'em? What am I gonna tell 'em that's gonna help me? Nothing."

Defendant and the *Perkins* agent talked, in total, for about two hours, during which time defendant made various incriminating statements. Defendant was then taken to a formal interview with the detectives and read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant invoked his right to counsel.

## 1.2    Analysis

In *Perkins*, the Supreme Court held that voluntary statements by an incarcerated defendant to an undercover agent are admissible to prove guilt, concluding the interests protected by *Miranda* were not implicated. (*Perkins*, *supra*, 496 U.S. at p. 300.)

Defendant acknowledges the holding in *Perkins*, as well as California law following *Perkins*. (See, e.g., *People v. Orozco* (2019) 32 Cal.App.5th 802, 813–815.) However, defendant says that some courts have recently begun to question the validity of *Perkins* operations, finding them to be deceptive police tactics specifically intended to circumvent the safeguards of *Miranda*. Defendant points out the Supreme Court is currently considering

7

the issue in *People v. Allen*, review granted November 20, 2024, S286520.

But the chief issue under review in *People v. Allen* arises from the fact the defendant there invoked his right to remain silent during custodial interrogation. The Supreme Court granted review to determine whether the defendant's invocation of his right to remain silent affected the admissibility of the incriminating statements made by the defendant during a subsequent *Perkins* operation. (*People v. Allen*, *supra*, review granted.) Other cases that have found incriminating statements made during a *Perkins* operation to be inadmissible similarly involve defendants who invoked *Miranda* rights, and then made incriminating statements in a subsequent *Perkins* operation. (See, e.g., *People v. Zapata* (2026) 118 Cal.App.5th 529, 540–543.)

These cases have no applicability here as defendant concedes he never invoked his rights under *Miranda* prior to making statements to the *Perkins* agent. He nevertheless argues the practice used by the detectives was deceptive and violated his rights. He says his statements to the *Perkins* agent show he intended to assert his *Miranda* rights when interviewed by the detectives, and that he did so immediately once those rights were read to him at the start of the formal police interview. Defendant therefore urges us to conclude his statements to the *Perkins* agent, obtained only by intentionally delaying his formal interview, should have been excluded at trial.

Defendant's argument fails to acknowledge the plain reasoning of *Perkins*. *Perkins* instructs that "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." (*Perkins*, *supra*, 496 U.S. at p. 298.) Rather,

8

"*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. As we recognized in *Miranda*, 'confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.' [Citation.] Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Perkins*, *supra*, 496 U.S. at p. 297.)

Nothing in the transcript of the *Perkins* operation here raises any inference that defendant's constitutional rights were violated. Defendant made voluntary statements to the *Perkins* agent *before* he invoked his right to counsel at a later interrogation by detectives. His statements were therefore properly admitted at trial.

## 2.    The prosecutor's closing argument

Defendant argues the prosecutor committed misconduct during closing argument by urging the jury to view the crime through the victims' eyes, telling the jury defendant had a disposition to commit crimes, and making arguments in violation of a court order. Defendant concedes his trial counsel did not raise any objections to the portions of argument he now contends were improper. Defendant urges us to exercise our discretion to resolve his claim on the merits, or alternatively, to find his trial counsel provided ineffective assistance for failing to object. We conclude defendant forfeited his claim of prosecutorial misconduct, and has failed to demonstrate ineffective assistance of counsel.

### 2.1 Forfeiture

A claim of prosecutorial misconduct is not cognizable on appeal unless the defendant objects and requests an admonition in the trial court, if an objection and jury admonition would have cured the harm. (*People v. Young* (2019) 7 Cal.5th 905, 933; accord, *People v. Crew* (2003) 31 Cal.4th 822, 839; *People v. Scott* (1997) 15 Cal.4th 1188, 1217.)

It is undisputed no objections were raised below. We decline defendant's invitation to exercise our discretion to consider his claim on the merits. Defendant has not shown that an objection or request for admonition would have been futile, nor has he shown the alleged misconduct deprived him of due process or otherwise resulted in a trial that was fundamentally unfair. Moreover, as we explain below, even if defendant had preserved the right to argue prosecutorial misconduct, reversal would not be warranted.

### 2.2 Ineffective assistance

We also conclude defendant has not established a claim of ineffective assistance of counsel.

On direct appeal, a defendant bears a heavy burden in demonstrating a claim of ineffective assistance of counsel. (*People v. Garcia* (2022) 76 Cal.App.5th 887, 900.) A defendant must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696.)

The Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to

10

act in the manner challenged[,] … unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal *must be rejected*.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267, italics added; *People v. Johnson* (2016) 62 Cal.4th 600, 653–654 (*Johnson*); *People v. Lewis* (2001) 25 Cal.4th 610, 674–675.)

Defendant contends resolution on direct appeal is appropriate because the prosecutor's improper argument was so egregious that no competent attorney would have failed to assert timely objections and seek appropriate admonishments from the court. We address each of his claims in turn.

### 2.2a  Viewing crime through victim's eyes

Defendant says the prosecutor, in discussing the shooting incident of December 2020, improperly urged the jury to view the crimes through the eyes of the victims. The prosecutor told the jury that the testimony of Bionca, Jesus, and another witness named Rosalva, who saw the events from inside the home, gave them "a snapshot of the trauma … [w]hat it feels like to be shot … [w]hat it feels like to watch someone lose their life while trying to save another."

It is improper for a prosecutor to invite the jury to view the crime through the eyes of the victim, because it necessarily invites the jury to rely on sympathy and emotion, and not on an objective view of the evidence. A prosecutor commits misconduct by making "arguments to the jury that give it the impression that 'emotion may reign over reason,' " or by presenting " 'irrelevant information or inflammatory rhetoric that diverts the jury's

11

attention from its proper role, or invites an irrational, purely subjective response.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 66 (*Sanchez*); *People v. Mendoza* (2007) 42 Cal.4th 686, 704.)

In *Sanchez*, the prosecutor invited the jury to "imagine" the murder victim's final thoughts. (*Sanchez*, *supra*, 7 Cal.5th at p. 66.) *Sanchez* rejected the defendant's claim of misconduct, explaining that the prosecutor's plea to the jury only indirectly suggested the jury should view the crime though the victim's eyes. (*Ibid*.) *Sanchez* said the prosecutor's argument was irrelevant to a determination of the defendant's guilt and therefore should not have been made. (*Ibid*.) But because the comment was a brief reference in an otherwise lengthy and unobjectionable argument, there was no reasonable probability the jury would have reached a different result had the comment not been made. (*Id.* at pp. 66–67.)

Similarly here, the prosecutor's argument that the victims' testimony provided the jury with a snapshot of what it felt like to be shot and to see someone die was irrelevant to a finding of guilt, but it did not directly urge the jury to rely on sympathy for the victims and to disregard the evidence. In fact, the brief comment was part of a lengthier argument in which the prosecutor specifically pointed out certain key aspects of the victims' testimony describing how the shooting occurred, and emphasized where their testimony was corroborated by the video footage from nearby security cameras.

Thus, even assuming this brief reference by the prosecutor constituted improper argument, we cannot conclude that trial counsel was ineffective for not objecting. Defense attorneys have broad discretion in matters of trial tactics and "in choosing the means by which to provide constitutionally adequate

12

representation." (*Johnson, supra*, 62 Cal.4th at p. 653.) Defense counsel may have had a valid reason for choosing not to object, including not wanting to highlight that part of the prosecutor's argument. In any event, defendant also has not shown a reasonable probability the jury would have reached a different result had the comment not been made.

### 2.2b  Disposition to commit crime

Defendant contends the prosecutor improperly told the jury he had an evil disposition. The prosecutor argued that considering all of defendant's gang tattoos, the most important one was the tattoo that said "down with my demons." The prosecutor said that tattoo "tells you everything about his mentality. That he is embracing that evil side. And because he's down with his demons, he is the type of person who is willing to deliver death to these two completely innocent men."

A prosecutor has broad latitude during closing argument, and may use strong and descriptive language, as well as epithets, so long as it is fair comment on the evidence, including reasonable inferences to be drawn therefrom. (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison*); accord, *People v. Jackson* (2016) 1 Cal.5th 269, 349.) " ' "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness." ' " ' " (*Harrison*, at p. 244.)

Moreover, any improper argument must be viewed in the context of the prosecutor's entire argument, as well as the court's instructions to the jury. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) A defendant must show a reasonable likelihood the jury understood the challenged statements in an improper or objectionable manner. (*Ibid.*; accord, *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) In making this assessment, " 'we "do

not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Centeno*, at p. 667.)

In *Harrison*, the Supreme Court concluded that a prosecutor's description of the defendant as a "habitual killer," "the executioner," a "denizen of the night," and a "creator of victims" who enjoyed killing, among other epithets, "did not exceed the bounds of proper argument, given the evidence that [the] defendant shot two people in the head at point-blank range over a purchase of fake cocaine." (*Harrison*, *supra*, 35 Cal.4th at p. 245.) A further comment by the prosecutor that the defendant had a "predisposition" to kill was found harmless because of the strong evidence of guilt. (*Id*. at pp. 245–246.)

Here, it was fair for the prosecutor to argue reasonable inferences arising from the gang evidence, including defendant's multiple tattoos, and how the prosecutor believed they helped establish the motive for the shootings. But to the extent the prosecutor asserted that defendant had a predisposition to commit murder, that was improper and arguably should have been objected to by trial counsel and a request for admonition to the jury made.

Nevertheless, it was harmless in light of the overall argument and the evidence in the record, including defendant's admissions. In addition, the jury was instructed with CALCRIM No. 1403 which told them that they could not conclude from any gang evidence "that the defendant is a person of bad character or that he has a disposition to commit crime." Defendant has not affirmatively demonstrated a reasonable probability of a different result had the argument not been made.

### 2.2c  Violating court order

Defendant contends the trial court ordered that his *Perkins* statements were admissible only on the issues of motive and intent to kill, but not to prove identity.  Defendant says the prosecutor violated that order by arguing at several different points during closing argument that his admissions during the *Perkins* operation proved he was the shooter.  For example, the prosecutor told the jury that the transcript of the *Perkins* operation was "chock-full of details that only the killer could know," and argued that defendant laid out all "the details of how Jose was killed."

Defendant misstates the scope of the trial court's order.  At the pretrial hearing on February 27, 2024, the court heard argument and ruled on the parties' motions in limine under Evidence Code section 402.  With respect to the transcript of the *Perkins* operation, the parties agreed that certain portions of the transcript would be redacted.  Defendant then argued that additional portions should be stricken.  The court denied the request, finding the statements were relevant on the issue of consciousness of guilt and therefore admissible.

The court then proceeded to discuss the prosecutor's motion concerning the relevance and admissibility of certain gang evidence.  The court explained that "this gang information has to be analyzed in a different light" than the *Perkins* statements generally because gang evidence can be used by a jury for the "wrong reasons."  The court noted that some of the statements made by defendant to the *Perkins* agent were gang-related, such as explaining that he and his "homies" had been out "patrolling" when they came upon one of the victims.  The court ruled the gang evidence was therefore relevant and admissible to show

15

motive and intent to kill. The court said however that it did not believe the gang evidence was relevant to prove identity. The court also excluded evidence of other crimes committed by the gang.

But nothing in the court's ruling indicates that all statements made by defendant during the *Perkins* operation were only admissible to show motive and intent to kill. The limitation was imposed *only* with respect to gang evidence. The prosecutor therefore acted within the bounds of fair argument by pointing out all of the evidence, including admissions by defendant during the *Perkins* operation, that he believed demonstrated defendant's guilt, and trial counsel was not ineffective for not raising an objection.

## 3. Cumulative error

Defendant briefly asserts that the admission of his *Perkins* statements and the prosecutor's misconduct should be considered together for their cumulative prejudicial effect. As we explained above, defendant has not shown any prejudicial errors, and there is no basis to find cumulative error.

## 4. The abstract of judgment

The People concede the abstract of judgment should be corrected. We agree. Paragraph 1 of the abstract correctly identified the two murder counts as counts 1 and 4, but paragraph 6c incorrectly identified counts 1 and 2 (count 2 was not a part of the operative amended information). On remand, the superior court is directed to prepare a new abstract of judgment that correctly identifies the murder counts on which defendant was convicted as counts 1 and 4.

**DISPOSITION**

The judgment of conviction is affirmed. On remand, the superior court is directed to prepare a new abstract of judgment that correctly identifies the murder counts as counts 1 and 4, and to forward the new abstract of judgment to the Department of Corrections and Rehabilitation.


VIRAMONTES, J.


WE CONCUR:


WILEY, Acting P. J.


SCHERB, J.


17